IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| **JESSICA BALLARD**, ) | |
| ) | **Case No. 14-cv-3572** |
| Plaintiff, ) | |
| ) | **Jury Trial Demanded** |
| vs. ) | |
| ) | **Honorable Judge Elaine Bucklo** |
| **CANADIAN NATIONAL RAILWAY** ) | |
| **CORPORATION** d/b/a **ILLINOIS CENTRAL** ) | **Honorable Magistrate** |
| **RAILROAD COMPANY**, a corporation, ) | **Judge Maria Valdez** |
| **ILLINOIS CENTRAL RAILROAD** ) | |
| **COMPANY**, a corporation, and **PAMELA** ) | |
| **CLERMONT**, individually ) | |
| ) | |
| Defendants. ) | |
| ) | |

## FIRST AMENDED COMPLAINT

NOW COMES the Plaintiff, **JESSICA BALLARD** ("Jessica" or "Plaintiff") by and through her attorneys, The Prinz Law Firm, P.C., and brings this First Amended Complaint against Defendant, **CANADIAN NATIONAL RAILWAY, CO**. ("CNR"), also doing business as **ILLINOIS CENTRAL RAILROAD COMPANY**, a corporation, Defendant **ILLINOIS CENTRAL RAILROAD COMPANY** ("ICRC"), a corporation, and Defendant **PAMELA CLERMONT** ("Ms. Clermont"), (collectively "Defendants"), an individual.

## INTRODUCTION

1. This action is brought against Defendants CNR and ICRC ("Employer") pursuant to the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/101, *et seq.*, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1), and Section 1981, 42 U.S.C. § 1981 because the employer discriminated against, and terminated, an employee due to her race, African-American. This action is also brought against Defendant Ms. Clermont pursuant to

Section 1981, 42 U.S.C. § 1981 for discriminating against an employee due to her race, African-American.

2. To create pretext to terminate Jessica's employment, there were three sham investigations conducted in one day regarding minor infractions. In reality, Jessica did not violate any policies. One of the alleged infractions was due to a common computer program error beyond Jessica's control. As for the other two alleged infractions, Jessica properly relied upon the representations of her managers, and co-workers when conducting her job.

3. There was not an investigation or termination of similarly situated Caucasian employees that engaged in the same or similar conduct as Jessica.

4. Shortly after conducting the investigations, Jessica's employment was terminated, causing her extreme depression and emotional distress.

5. As these violations were committed willfully, Plaintiff seeks statutory damages, costs, and attorneys' fees.

**THE PARTIES**

6. During the relevant periods of this Amended Complaint, Jessica worked in the Northern District for CNR and/or ICRC.

7. Defendant CNR is a foreign corporation that conducts business in Illinois as Illinois Central Railroad Company, located at 17641 Ashland Avenue, Homewood, Illinois, 60430. CNR is engaged in an industry affecting commerce and employs more than fifteen people. CNR is thus an "employer" within the meaning of Sections 701 (b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e(b),(g), and (h).

8. Defendant ICRC is a corporation that conducts business in Illinois at 17641 Ashland Avenue, Homewood, Illinois, 60430. It is engaged in an industry affecting commerce

and employs more than fifteen people. It is thus an "employer" within the meaning of Sections 701 (b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e(b),(g), and (h).

9. During the relevant periods of this Amended Complaint, Defendant Pamela Clermont was Plaintiff's direct supervisor within the meaning of Section 1981. She worked within this judicial district for the relevant time periods of this Amended Complaint, and the alleged conduct occurred in this district.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over all claims presented in this action pursuant to 28 U.S.C. §§1331, 1343(a), & 1367(a).

11. Venue properly lies within the Northern District of Illinois pursuant to 28 U.S.C. § 1391 in that the events giving rise to all of Plaintiff's claims took place here, and Defendants conduct business in the Northern District of Illinois.

12. Jessica filed a Charge with both the EEOC and the Illinois Department of Human Rights. The EEOC mailed a Notice of Right to Sue on February 24, 2014. (RTS, attached as Ex. 1.)

## FACTUAL ALLEGATIONS

13. Jessica, an African-American employee, started her employment in January of 2008.

14. Jessica's most recent position was as a Crew Management Center ("CMC") Crew Caller ("Crew Caller"). This was her primary position throughout the duration of her employment.

15. Between 2008 and 2011, Jessica received positive performance reviews and feedback from her supervisors.

3

16. In her 2008 performance review, Jessica's former supervisor wrote "Jessica continues to improve . . . the sky's the limit."

17. In her 2009 performance review, Jessica's former supervisor wrote, "Jessica has learned much since coming into the CMC. She is anxious to learn and a willing student."

18. Finally, in her 2010 performance review, Jessica's former supervisor wrote, "Jessica is an experienced crew dispatcher and often helps the center by picking up extra shifts."

19. Starting around November 2011, Ms. Pamela Clermont, a Caucasian woman, became Jessica's supervisor.

20. Ms. Clermont testified that from November 2011 through Jessica's termination that Ms. Clermont worked as the Regional Manager for Crew Management in the southern region. From April 2011 until November 2011, she worked as the manager in the CMC.

21. Thereafter, Jessica's work environment changed due to Ms. Clermont's racial bias. Over the next fourteen months, Defendants began to create pretext to terminate Jessica's employment due to her race. During the same time period, Defendants discharged other African American employees, while providing preferential treatment to similarly situated Caucasian employees.

22. Ms. Clermont once made a statement to Jessica that she would be terminated "like the other black girls" that were terminated.

23. Ms. Clermont often threatened Jessica with termination without any cause.

24. Ms. Clermont continuously accused Jessica of engaging in prohibited conduct, such as taking personal phone calls at work, with no evidence for the accusations. Jessica was allowed to make phone calls if she stepped out of her work area, and she followed the rules regarding the use of her phone.

25. Ms. Clermont often made critical comments to Jessica about the amount of money she made.

26. Upon information and belief, to create pretext for her termination, Ms. Clermont had other employees listen to Jessica's phone calls. Upon information and belief, Ms. Clermont did not have other employees listen to the phone conversations of similarly situated Caucasian co-workers.

27. Ms. Clermont intentionally created a harassing and stressful work environment for Jessica, despite Jessica's past success as an employee.

28. Within months of becoming Jessica's supervisor, Ms. Clermont provided Jessica with a negative performance review.

29. Prior to Ms. Clermont becoming Jessica's supervisor, Jessica received positive performance reviews.

30. Around May 2012, Ms. Clermont began setting Jessica up for termination.

31. First, Ms. Clermont falsely accused Jessica of using a personal cell phone around 8:00 PM on May 13, 2012. However, Jessica's phone records indicate that she did not make any phone calls at that time.

32. Next, Ms. Clermont falsely accused Jessica of sleeping while on duty on May 30, 2012. Ms. Clermont did not have evidence to support her accusation. Instead, Jessica was alert throughout the work day.

33. Jessica was forced to endure three meritless investigations on October 23, 2012.

34. The subject of the first investigation was Ms. Clermont's accusation that Jessica "tied up" a crew in Jackson, Mississippi on or around September 17, 2012. According to Ms. Clermont, Jessica should not have "tied up" any crew.

35. A "tie up" is essentially a process of entering information into a computer regarding the employee's duty tour and indicating that the employee has finished the job for the day.

36. Jessica believed that she could "tie up" an employee if the employee is in a location in which the employee is unable to enter the proper information into a computer. Further, she believed that the policies allowed her to "tie up" a co-worker.

37. It was a common practice among Jessica's co-workers to "tie up" crews.

38. Ms. Clermont accused Jessica of failing to follow a policy emailed to all employees on or around April 24, 2012.

39. Between April 24, 2012 and September 17, 2012, several employees conducted "tie ups."

40. Between April 24, 2012 and September 17, 2012, no manager or supervisor directly informed Jessica to stop this "tie up" process.

41. Further, other managers had instructed Jessica to "tie up" crews. These managers worked the afternoon shift with Jessica. Ms. Clermont did not work this same shift.

42. On or around September 17, 2012, a co-worker called Jessica from Yazoo City, Mississippi and asked her to enter the time he was leaving work into a computer database. The co-worker received one hour of travel time from Yazoo City, Mississippi to Jackson, Mississippi. He asked her to enter in a time for about one hour after he called.

43. In the area that co-worker was working, he received one hour travel time. He also was not near a computer terminal at which he could enter in the time he finished working.

44. Ms. Clermont testified at the investigation hearing that this particular co-worker and his crew routinely asked to be "tied up."

45. Ms. Clermont even conceded during the investigation that since another supervisor indicated Jessica could "tie up" the crews, she should have followed the direction of the manager.

46. Despite the fact that Jessica's Caucasian co-workers "tied up" crews, and the fact that Jessica received approval from another manager, her employment was still terminated.

47. Further, the Agreement between the Defendant and the employees provides that an investigation should occur within ten days of the alleged incident.

48. Here, the investigations were conducted almost a month after the alleged incident. Despite being aware of the incident as of October 4, 2012, an investigation did not occur until October 23, 2012, well past the ten day rule.

49. Jessica was also accused of conducting another "tie up" for a different employee on or around September 29, 2012.

50. In that case, the employee called and asked to be "tied up" for a previous time period, as he had gone home and forgot to enter the information into the computer.

51. Also on October 23, 2012, a second investigation was initiated into whether Jessica improperly permitted an employee to return to work from medical leave on October 13, 2012 ("Returning Employee").

52. The Returning Employee called Jessica on October 13, 2012 and informed her he could return to work from his medical leave. He asked Jessica to "mark him up," allowing him to return to active service on October 14, 2012.

53. She complied with his request, based on the Returning Employee's representation.

7

54. In addition, another co-worker indicated that the Returning Employee could work on October 14, 2012, and that the Returning Employee had sufficient documentation to return to work.

55. Further, the Returning Employee was officially allowed to return to work on October 15, 2012.

56. However, it was determined that the Returning Employee was not able to return from his medical leave on October 14, 2012, but instead he had to wait until October 15, 2012 to return to work.

57. It was determined that Jessica violated its policy by allowing the Returning Employee to return to work on October 14, 2012 instead of October 15, 2012, even though she accepted another co-worker's clearance and the Returning Employee's representation that he could return to work on October 14, 2012 from his medical leave.

58. Upon information and belief, the Returning Employee, a Caucasian employee, did not receive a sanction, but Jessica was sanctioned for approving his request one day early.

59. A third investigation was conducted on October 23, 2012 after Jessica allegedly called the wrong conductor for an assignment.

60. During this investigation, it was admitted that the computer system, not Jessica, made an error and incorrectly listed the wrong conductor. This was a common problem and the error was a human mistake in programming the computer database.

61. Despite the fact that the computer system made the error, an investigation was still conducted regarding Jessica's conduct, and the error was used as pretext to terminate her employment.

62. The three investigations that occurred on October 23, 2012 resulted in the termination of Jessica's employment on November 2, 2012.

63. The fact that there were three investigations conducted on the same day regarding minor offenses from weeks earlier provides evidence of suspicious intent.

64. In addition, one of the investigations was conducted more than ten days after the alleged incident, in violation of its agreement with its employees.

65. The timing of the three investigations combined with the suspicious intent indicates that Defendants created pretext to terminate Jessica's employment.

66. Upon information and belief, during the time that Ms. Clermont worked with Jessica in Illinois, she discharged other African American employees.

67. Several other Caucasian employees were similarly situated and did not receive discipline despite engaging in similar, or more egregious, conduct.

68. Upon information and belief, a Caucasian employee brought a weapon to work, and Jessica informed human resources ("HR") about this conduct. However, the HR department did not respond to Jessica's inquiries.

69. Upon information and belief, another Caucasian employee threw a cup of coffee against a wall and yelled at a supervisor; however, the employee did not receive discipline.

70. Upon information and belief, another Caucasian employee routinely arrived at work under the influence of alcohol. Despite this conduct, upon information and belief, the employee did not receive discipline.

71. On February 4, 2014, another employee filed a lawsuit regarding racially discriminatory conduct. *See Solomon Perry v. Ill. Central Railroad Co.*, No. 1:14-cv-00756 (N.D. Ill. Feb. 4, 2014). Mr. Perry alleges that "In a work environment rife with racial tensions,

9

Mr. Perry, who was employed . . . as a Conductor/Engineer Trainee, was assaulted by co-workers who cut his hair with a knife while making derogatory comments about his race and religion." *Id.* ¶ 3.

72. As a direct result of the conduct, Jessica has experienced extreme emotional distress and severe financial hardship. The conduct forced Jessica to move herself and her two children out of their home of five years.

73. If Jessica was not terminated, she would have made approximately $90,000 in 2012.

**COUNT I: RACE DISCRIMINATION IN VIOLATION OF TITLE VII**
**(against Defendant CNR and Defendant ICRC)**

74. Plaintiff adopts and re-alleges the allegations contained in paragraphs 1–73.

75. Title VII, as amended, prohibits employers from subjecting their employees to discrimination with respect to terms, conditions, benefits, or privileges of employment based race, including with respect to employee performance evaluations and investigations. 42 U.S.C. § 2000e-2(a)(1) ("Title VII").

76. During all events relevant and pertinent to this action, Defendant CNR was an "employer" within the meaning of Title VII.

77. During all events relevant and pertinent to this action, Defendant ICRC was an "employer" within the meaning of Title VII.

78. Jessica was an "employee" within the meaning of Title VII.

79. Jessica was denied equal terms, conditions, benefits, or privileges of employment because of her race. Specifically, the meritless investigations, negative performance reviews, and poor treatment given to Jessica upon Ms. Clermont's arrival were done solely because of Jessica's race.

80. Any proffered reason for Jessica's termination is only pretext.

81. Jessica was treated differently, and worse, than several similarly situated Caucasian employees.

82. The actions were willful, intentional, and done maliciously with callous disregard or reckless indifference to Jessica's federally protected rights. Exemplary damages are warranted to prevent similar unlawful conduct.

83. Jessica was and continues to be damaged by the discriminatory conduct.

**PRAYER FOR RELIEF**

84. WHEREFORE, Plaintiff, Jessica Ballard, requests that this Court enter an Order

   a. Finding that Plaintiff was racially discriminated against in violation of Title VII of the Civil Rights Act, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) ("Title VII");

   b. Finding Plaintiff was terminated due to her race in violation of Title VII of the Civil Rights Act;

   c. Finding that Defendant CNR's conduct was willful;

   d. Finding that Defendant ICRC's conduct was willful;

   e. Making Plaintiff whole by an appropriate award of monetary damages resulting from the conduct;

   f. Awarding Plaintiff reinstatement, or, in the alternative, front pay;

   g. Awarding Plaintiff punitive damages for the conduct;

   h. Awarding Plaintiff costs of this action including reasonable attorneys' fees; and

   i. Granting such other and further or different relief as the Court may deem just and proper.

## COUNT II – RACE DISCRIMINATION IN VIOLATION OF THE ILLINOIS HUMAN RIGHTS ACT
### (against Defendant CNR and Defendant ICRC)

85. Plaintiff adopts and re-alleges the allegations contained in paragraphs 1–84.

86. The Illinois Human Rights Act prohibits the discrimination of any individual because of her race in connection with that individual's employment. 775 ILCS 5/101, *et seq.*

87. Jessica was subjected to unequal treatment based on her race in connection with her employment. Specifically, the negative performance reviews and poor treatment given to Jessica upon Ms. Clermont's arrival were done so solely because of Jessica's race. This is especially evident when viewed through the context of the treatment and preference afforded similarly situated Caucasian employees.

88. Jessica was further discriminated because of her race when she was terminated under false pretext.

89. Jessica was treated differently than several similarly situated Caucasian employees.

90. Pretext was created to terminate Jessica's employment due to her race.

91. The actions in intentionally subjecting Jessica to adverse terms and conditions of employment because of her race have caused and are continuing to cause damages.

### PRAYER FOR RELIEF

92. WHEREFORE, Plaintiff, Jessica Ballard, requests that this Court enter an Order

   a. Finding that Plaintiff was racially discriminated against in violation of the Illinois Human Rights Act, 775 ILCS 5/101, *et seq.*;

   b. Finding that Plaintiff was terminated due to her race in violation of the Illinois Human Rights Act;

c.  Making Plaintiff whole by an appropriate award of monetary damages resulting from the conduct;

d.  Awarding Plaintiff costs of this action including reasonable attorneys' fees; and

e.  Granting such other and further or different relief as the Court may deem just and proper.

**COUNT III – RACE DISCRIMINATION IN VIOLATION OF SECTION 1981**
**(against Defendant CNR, Defendant ICRC, and Defendant Pamela Clermont)**

93. Plaintiff adopts and re-alleges the allegations contained in paragraphs 1–92.

94. Section 1981 prohibits discrimination with a contractual relationship based upon an employee's race. 42 U.S.C. § 1981.

95. Ms. Clermont was Jessica's direct supervisor and is liable for her discrimination pursuant to Section 1981. *See Smith v. Bray*, 681 F.3d 888, n.2 (7th Cir. 2012) (collecting cases).

96. Defendants subjected Jessica to unequal treatment based on her race in connection with her employment. Specifically, the negative performance reviews and poor treatment given to Jessica upon Ms. Clermont's arrival were done so solely because of Jessica's race. This is especially evident when viewed through the context of the treatment and preference afforded similarly situated Caucasian employees.

97. Defendants further discriminated against Jessica because of race when they terminated Jessica under false pretext.

98. Defendants treated Jessica differently than several similarly situated Caucasian employees.

99. Defendants created pretext to terminate Jessica's employment due to her race.

100. Defendants' actions in intentionally subjecting Jessica to adverse terms and conditions of employment because of her race have caused and are continuing to cause damages.

101. Jessica suffered losses, both economic and emotional, as a result of the discrimination.

## PRAYER FOR RELIEF

102. WHEREFORE, Plaintiff, Jessica Ballard, requests that this Court enter an Order

   a. Finding that Defendants discriminated against Plaintiff and violated Section 1981, 42 U.S.C. § 1981;

   b. Awarding Plaintiff reinstatement and/or awarding other appropriate equitable relief, such as front pay;

   c. Awarding Plaintiff appropriate damages to compensate her for any and all lost wages and other benefits and/or any other appropriate relief to which she is entitled;

   d. Awarding Plaintiff lost future earnings to compensate her for her loss;

   e. Awarding Plaintiff compensatory damages in an appropriate amount and as allowed by law;

   f. Awarding Plaintiff punitive damages in an appropriate amount and as allowed by law;

   g. Awarding Plaintiff pre-judgment interest on the above damages;

   h. Awarding Plaintiff her reasonable attorneys' fees, costs, and litigation expenses (including expert witness fees); and

   i. Granting such other and further relief that this Court deems just.

## DEMAND FOR JURY TRIAL

103. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Jessica demands a trial by jury of all issues raised in this Amended Complaint.

Dated: June 06, 2014

                                                          Respectfully submitted,

                                                          Jessica Ballard

                                                          By: /s/ Amit Bindra
                                                          One of Plaintiff's Attorneys

The Prinz Law Firm, P.C.
Kristen E. Prinz
Jessica Fayerman
Amit Bindra
1 East Wacker Street, Suite 550
Chicago, IL 60601
P: (312) 212-4450
F: (312) 284-4822
E: kprinz@prinz-lawfirm.com
E: jfayerman@prinz-lawfirm.com
E: abindra@prinz-lawfirm.com