IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Jessica Ballard,                )
                                )
        Plaintiff,               )
                                )
    v.                           )   No. 14 C 3572
                                )
Illinois Central Railroad        )
Co., and Pamela Clermont,        )
individually,                    )
                                )
        Defendants.              )

<u>Memorandum Opinion and Order</u>

In this action, Jessica Ballard, who is African American, claims she was terminated from her job as a crew caller for Illinois Central Railroad ("ICR") because her supervisor, Pamela Clermont, harbored racial animus against her. She sues her employer under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) and Section 1981, 42 U.S.C. § 1981, and also sues Clermont individually under the latter. Before me is defendants' motion for summary judgment, which argues that the undisputed record shows that plaintiff was appropriately terminated for violating company policies after progressive discipline, not for any discriminatory reason. Because I agree that the record as a whole does not reasonably support plaintiff's discrimination claims, I grant defendants' motion.

I.

The following facts are undisputed except where noted. Plaintiff began working for defendant in approximately January of 2008. After being disqualified from two positions for performance reasons,[1] she bid on and obtained a crew caller position, which she held until her termination in October of 2012. Crew callers are part of ICR's Crew Management Center ("CMC"), and their duties include calling train crews to make sure that employees are assigned to staff the right trains at the right times. In addition, crew callers are responsible for recording when crew members call in sick or otherwise need to take time off work. In some circumstances, crew callers are also responsible for "tying up" train crews at the end of their shifts (i.e., recording the time at which they went off-duty).

Pursuant to their collective bargaining agreement, crew callers believed to have violated company rules, practices, or policies are entitled to a formal investigation, including a fact-finding hearing, prior to being disciplined. They may,

---

[1] Plaintiff's personal work record reflects that she was disqualified from positions in "train reporting" and "material handling." Plaintiff testified that she was not successful in these positions, explaining that she "didn't get great training" in the first, and that the second was "a man's job" at which she "didn't do well." Ballard Dep. at 87:12, 88:17-18. She does not dispute defendants' statement that she was disqualified from these positions "due to performance reasons." Pl.'s L.R. 56.1(a) Resp. at ¶ 11.

however, waive investigation and accept responsibility for the alleged violation.

Plaintiff's 2008 performance review, memorialized in an "Employee Performance Scorecard," contained positive comments about her work, noting that as a "new arrival...[plaintiff] has already made contributions" and that she "continues to improve and take advantage of her fellow callers to learn from them...the sky's the limit." DN 117-2 at 9.[2]

Sometime in 2009, Human Resources investigated a complaint against plaintiff in which a coworker alleged that plaintiff used "curse words" and called the coworker profane names. Plaintiff admitted that she used profanity but asserted that it "wasn't in a negative way." Plaintiff was not disciplined for the incident. Ballard Dep. at 135:12-24, 136:13-17, DN 117-1 at 18. Plaintiff's 2009 Scorecard, which ranked her overall performance as a "skilled railroader" (the available options being "outstanding railroader," "superior railroader," "skilled

---

[2] The manner in which the parties organized their filings does not lend itself to a unified system of citation (nor, indeed, does it facilitate locating the cited documents in the record). Accordingly, for simplicity and ease of reference, I cite where possible to docket entries and to the page numbers automatically generated by the CM-ECF system. One notable exception is where plaintiff cites to evidence I allowed to be filed under seal pursuant to her motion. See DN 123, 124. Because plaintiff never actually filed the evidence, however, but provided only a courtesy copy to my chambers, I cannot cite to it by docket entry. Defendant has raised no objection to plaintiff's reliance on the unfiled evidence for present purposes.

railroader," "needs to improve," and "new employee") included a handwritten comment by supervisor Craig Dettman that "sometimes in her haste she makes bad decisions, but when she is focused she handles herself well." DN 117-2 at 14.

In May of 2010, plaintiff was notified of an investigation after missing a call while working. Plaintiff admitted that she missed the call, but explained that the investigation did not proceed because it was her "first offense." Ballard Dep. at 139:1, DN 117-1 at 19. Plaintiff was not disciplined for the incident. *Id*. at 139:14-15. Then, in December of 2010, plaintiff was notified of an investigation arising out of her failure to call a replacement engineer while working as a crew dispatcher. DN 117-2 at 21. Plaintiff waived her right to a formal investigation and received a five day deferred suspension.[3] Ballard Dep. at 147:13-24, DN 117-1 at 21. Plaintiff's 2010 Performance Scorecard ranked her overall performance as "needs improvement," and included handwritten comments by her supervisor that referred to her as an "experienced crew dispatcher," and a "well rounded caller," but noted that she "often gets distracted which leads to mistakes." DN 117-2 at 19.

---

[3] The face of the document acknowledging plaintiff's waiver explains that a "deferred" suspension means that it "will not be served unless you are subsequently proven guilty of a violation of Company rules, policies, procedures, instructions, etc." within one year following the deferred suspension.

4

Defendant Clermont joined the CMC in 2011 and began supervising plaintiff sometime that year. In July of 2011, Clermont coached Ballard after she improperly marked an employee up for work. *See* Def.'s L.R. 56.1 Stmt. ¶ 23.[4] In August of 2011, Clermont sent plaintiff a letter of caution for using her personal cell phone or electronic device for non-company business while at work, in violation of company policy. DN 117-2 at 32; Pl.'s L.R. 56.1 Resp., Exh. 5 (sealed) at IC-Ballard 002399. On September 15, 2011, supervisor Craig Dettman coached plaintiff on crew calling procedures after she failed to call a brakeman for his shift. Def.'s L.R. 56.1 Stmt. ¶ 26. Plaintiff was not disciplined for this error. Then, on approximately November 18, 2011, plaintiff received a letter of reprimand for failing to fill a crew assignment properly. Pl.'s L.R. 56.1 Resp., Exh. 5 (sealed) at IC-Ballard 002400. Plaintiff's 2011 Performance Scorecard, which was signed by supervisor Ed Contreras, ranked her overall performance as "needs development." DN 117-2 at 35. The review contained numerous handwritten comments, including, "you have recently had many errors on the job," and "try to stay focused and improve your quality of work." *Id*. at 35.

---

[4] Plaintiff purports to dispute defendant's "characterization of the alleged incident," but the evidence supports defendants' characterization, and plaintiff points to no contrary evidence.

5

On May 16, 2012, and June 5, 2012, Clermont notified plaintiff of investigations to determine her responsibility, if any, for using a personal cell phone while working, and for sleeping while on duty. DN 117-2 at 44, 47. Plaintiff waived investigation of both incidents. She received a five day deferred suspension for the former violation and served a ten day actual suspension for the latter. *See* Ballard Dep. at 190-196 and Exh. 23; Pl.'s L.R. 56.1 Resp., Exh. 5 (sealed) at IC-Ballard 002399. Then, on October 15, 2012, plaintiff received three notices of investigation arising out of three separate incidents that occurred in September and October of 2012. Evidentiary hearings were held in each of these investigations on October 23, 2012.[5]

One of the investigations concerned two occasions on which plaintiff allegedly "tied up" crew members (i.e., marked them off-duty at the end of their shifts) in violation of company policies and directives. At the hearing, at which both plaintiff and Clermont testified, plaintiff acknowledged that she performed the tie-ups in the manner alleged, and further conceded that she was familiar with, but did not follow, instructions Clermont circulated in April of 2012. Indeed, the

---

[5] Plaintiff states, and defendants do not dispute, that she was not afforded the opportunity to waive these investigations. But plaintiff does not suggest any link between her race and the decision to require investigation of these incidents.

record reflects that on April 24, 2012, Clermont sent two emails to crew callers instructing them that crew members were generally required to tie themselves up using the company's Crew Assignment and Timekeeping System ("CATS"), subject to limited exceptions, such as when the crew was in a remote area without access to a CATS terminal, or when the time required for crew members to reach a CATS terminal would cause them to exceed their maximum allowable work hours. In those circumstances, crew callers could perform a "quick-tie" on the crew members' behalf, and were to follow a specific procedure when doing so. Tr. of 10/23/12 Hr'g. at 58:20-61:17, DN 117-2 at 69-70. Plaintiff admitted at the administrative hearing that she did not follow the specified procedure but instead followed her "normal routine" that she was "used to doing" because "nobody had made a big fuss or a big deal about it." Tr. of 10/23/12 Hr'g. at 61:5, 10-11, DN 117-2 at 70.

Hearings were also held on additional charges that on one occasion, plaintiff improperly scheduled a crew member to work before he was medically cleared, and on another, she improperly scheduled a crew member for duty on his rest day. Detailed examination of the evidence presented on these charges is unnecessary for present purposes. It suffices to note plaintiff and one of her immediate supervisors, Jessica Welch (who reported to Clermont), both provided testimony, and that

plaintiff did not deny the conduct attributed to her. With respect to the first charge, plaintiff acknowledged her failure to follow company procedures, but explained why she believed her conduct to be appropriate under the circumstances. Tr. of 10/23/12 Hr'g. at 49-52, DN 117-2 at 168. With respect to the second, she admitted to leaving a conductor on the work schedule after he called in to say he could not work because it was his rest day, but explained that she thought the conductor was "joking."[6]

Austin McConnell, who was then Superintendent of ICR's Regional Operations Center, states in his declaration that he reviewed the transcripts of the three investigation hearings and determined, in consultation with ICR's general manager, Hunt Cary, that termination was the appropriate level of discipline in view of plaintiff's disciplinary history. McConnell Decl. ¶ 4, DN 117-3 at 113. McConnell further states that he did not discuss plaintiff's termination with Clermont. *Id*. at ¶ 5. Plaintiff disputes the latter statement, insisting that Clermont was involved in the decision to terminate her. According to

---

[6] In her L.R. 56.1 Response, plaintiff states that a "programming error" caused ICR's computer to contact the conductor to indicate he was working on the day in question. During the investigation, however, plaintiff did not attribute her mistake to a programming error, but instead acknowledged that she "should have noticed" a code that on her computer screen indicating the conductor was not available to work. Tr. of 10/23/12 Hr'g. at 39-40, DN 117-2 at 124.

plaintiff, Clermont often threatened to fire her and once said she could "hold an investigation and...have you fired like I had those two other black girls fired." Ballard Dep. at 115:6-10, DN 117-1 at 13.

II.

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is genuinely in dispute when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I resolve all factual disputes in plaintiff's favor and give her "the benefit of all reasonable inferences that may be drawn from the record." *Coleman v. Donahoe*, 667 F.3d 835, 842 (7th Cir. 2012). Plaintiff is not entitled, however, to the benefit of inferences that are supported only by speculation or conjecture. *Boss v. Castro*, 816 F.3d 910 (7th Cir. 2016).

In *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518 (7th Cir. 1994), the Seventh Circuit observed that "[w]hile Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq., is rather straight-forward on its own terms...a rather thick judicial gloss, over twenty years deep, has developed, in part to accommodate difficult matters of proof in diverse factual

9

settings." *Id*. at 521. That "gloss" continued to deepen over the next two decades, even as judges expressed frustration with "the snarls and knots that the current methodologies used in discrimination cases of all kinds have inflicted on courts and litigants alike." *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (concurring opinion joined by entire panel). In a recent effort to cut through the morass of "disparate methods" and "elusive mosaics," the Seventh Circuit announced that "[t]he time has come to jettison these diversions and refocus analysis on the substantive legal issue." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764 (7th Cir. 2016). That issue, the court held, is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id*. at 165. The court emphasized that the evidence "must be considered as a whole" and that "[e]vidence is evidence," irrespective of whether it may be labeled "direct" or "indirect." *Id*. With these principles in mind, I turn to the parties' arguments.

In defendants' view, the undisputed facts refute plaintiff's theory that Clermont's racial animus was the reason for her termination. First, they argue that even assuming the truth of plaintiff's testimony that Clermont told her she would fire her as she had "those two other black girls," and further

10

assuming that this comment reflects racial animus, as opposed to merely a race-specific description of individuals who had recently been terminated, there is no evidence to suggest that Clermont's remark was related to the decision to terminate plaintiff. Indeed, plaintiff does not dispute that McConnell and Cary, not Clermont, were the ultimate decision makers with respect to her termination, nor does she assert that either of these individuals harbored racial animus against her. Instead, her theory is that Clermont set her up for termination—or, in her words, "created pretext to terminate" her—by issuing bogus investigations that were either factually unfounded or based on conduct that was tolerated by white employees. But even interpreting the facts in the light most favorable to plaintiff, the record simply does not support this theory.

Having waived formal investigation and admitted responsibility for three infractions between October 2011 and May 2012—all of which appear on the personal work record she concedes McConnell reviewed in deciding to terminate her employment—plaintiff cannot now be heard to complain that these investigations were factually unfounded. As for the three investigations that proceeded to evidentiary hearings, the record reflects that plaintiff admitted the factual basis for these violations too, and that her defense focused on her efforts to show either that her departure from ICR's

11

instructions was justified, or that it did not result in any actual harm to defendant. But "federal courts are not a super-personnel department that second-guesses facially legitimate employer policies. It is not the role of the court to determine whether an employer's expectations were fair, prudent, or reasonable." *Boss*, 816 F.3d at 917 (internal citation omitted).

Nor does plaintiff's insistence that the investigation proceedings were "flawed," or that Clermont "concealed facts" during the hearings entitle her to a trial on her discrimination claims. A review of the transcript establishes that plaintiff—who was represented by a union representative—had ample opportunity to question Clermont and to present her own arguments and evidence. Even if, as plaintiff claims, Clermont presented an "altered" email, she was free to challenge the authenticity of the email at the hearing. There simply is no factual basis in the record for concluding that the proceedings themselves were flawed, much less that any flaws were designed to cover up discrimination.

As for plaintiff's argument that she was unfairly disciplined for failing to follow Clermont's instructions to crew callers regarding tie-ups because the instructions were inconsistent or confusing, courts "cannot interfere because an employer's decision is unwise or unfair." *Widmar v. Sun Chemical Corp.*, 772 F3d 457, 464 (7th Cir 2014). At all events, I tend to

agree with defendants that if plaintiff found the instructions confusing, it behooved her to seek guidance from her managers (as indeed Clermont explicitly directed crew callers to do), rather than simply ignore them and go on with her "normal routine."

As for plaintiff's comparator evidence, her scattershot catalog of employees and infractions does not raise a reasonable inference that plaintiff was disciplined more harshly than any other employee based on her race. While plaintiff is correct that "the similarly-situated inquiry is flexible, common-sense, and factual," it nevertheless requires "sufficient commonalities on the key variables between the plaintiff and the would-be comparator" to raise a reasonable inference of discrimination when viewed in light of the evidence as a whole. *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). As illustrated below, plaintiff's comparator evidence falls woefully short.

In paragraphs 8-10 and 12-22 of her L.R. 56.1(b)(3)(C) statements, plaintiff describes various mistakes and misconduct allegedly committed by Caucasian employees, which she claims illustrate their more lenient treatment. But to the extent these paragraphs provide any of the "key variables" necessary for meaningful comparison, what they show is that plaintiff was treated just as favorably as, if not more favorably than, her comparators. For example, in paragraph 19, plaintiff states that

ICR "did not terminate a Caucasian employee even though she made numerous errors as a crew caller," and instead gave the employee a different position within the company. Plaintiff further asserts that the employee's personal work record "does not reflect her mistakes; but does indicate she was disqualified from her position." Pl.'s L.R. 56.1 Stmt. ¶ 19, DN 121 at 9-10. *See also id.* at ¶ 20 (describing similar infractions and discipline). The very same can be said of plaintiff, however, who, by her own admission, was disqualified from her first two positions for failing to perform adequately, and who made several errors as a crew caller that do not appear on her personal work record and for which she received no discipline.

In another paragraph, plaintiff describes a Caucasian employee who failed to fill a conductor position in November of 2011 and received a letter of reprimand; failed to go to work in August of 2012 and received a deferred suspension; failed to contact an engineer in November of 2012 and received a deferred suspension; and failed to contact a pilot and a foreman in March of 2013 and was disqualified as a crew caller. *Id*. at ¶ 17. By comparison, plaintiff—who received no discipline for her "first offense" of failing to call a crew member in May of 2010—also received a deferred suspension for a subsequent failure to call an engineer, and also received a letter of reprimand in November of 2011 for failing to fill a crew assignment. Similarly to her

comparator, plaintiff received a deferred suspension for a subsequent infraction, and, as noted above, had already been disqualified from her first two positions for performance reasons. In short, nothing about this comparison reasonably suggests that plaintiff was treated less favorably because of her race.

Other putative comparators are farther afield, and plaintiff's summary account of their discipline does not lend itself to meaningful comparison with her own. For example, in paragraphs 10 and 12, plaintiff asserts that ICR "did not terminate a Caucasian employee that failed a drug test" in November of 2013 and did not investigate an employee who gave out a personal cell phone number to another employee in September of 2011. Absent from plaintiff's factual statements, however, are "key variables" such as who supervised these individuals, who made the decisions about their discipline, and whether they had any past disciplinary history. Indeed, plaintiff does not even identify the second comparator's race. However "flexible" the similarly-situated analysis may be, it requires "enough common features between the individuals to allow a meaningful comparison." *Coleman*, 667 F.3d 835. As the foregoing examples illustrate, plaintiff's comparator evidence does not meet this test.

15

Nor does plaintiff's half-hearted invocation of quasi-statistical evidence suggest a discriminatory motive behind her termination. Plaintiff states that between 2008 and 2014, ICR noticed an investigation and subjected to discipline fifty CMC employees, of whom twenty-five were African-American, twenty were Caucasian, and five were Hispanic or Latino. Pl.'s L.R. 56.1 Stmt at ¶ 4, DN 121 at 3.[7] She further observes that of the six employees who were terminated during that time period, five were African-American while only one was Caucasian. *Id*. Plaintiff also asserts that during Clermont's tenure as Regional Manager for the Crew Management Division from November 2011 to April 2013, nineteen notices of investigation were issued to seven African-American employees, while ten notices of investigation were issued to five Caucasian employees. *Id*. at ¶ 5. Finally, she states that all four employees terminated while Clermont was Regional Manager were African-American. *Id*.

Plaintiff evidently believes that the foregoing figures speak for themselves, as her analysis goes no further than the numbers. But statistics are not meaningful in a vacuum, and plaintiff makes no effort to explain how the numbers she cites suggest that defendant's stated reason for her termination was

---

[7] Defendants state that the total number of employees disciplined was fifty-one, of whom twenty-one were Caucasian. The evidence appears to support defendants' position, *see* DN 121-6 at 4-6, but the difference is immaterial.

pretextual. To be sure, statistical evidence may be powerful in cases alleging a widespread pattern or practice of employment discrimination. *See Int'l Broth. of Teamsters v. U.S.*, 431 U.S. 324, 339 (1977). But even in such cases—of which this decidedly is not one[8]—the usefulness of statistics "depends on all of the surrounding facts and circumstances." *Id*. at 340. In this case, with no evidence at all about the circumstances under which the employees referenced in paragraphs 4 and 5 of plaintiff's factual statements were disciplined, the statistics she provides are meaningless.

Finally, plaintiff's suggestion that her termination must have been due to Clermont's racial animus because plaintiff's disciplinary record was clear prior to Clermont's arrival is contrary to the record. Indeed, plaintiff does not dispute that in May of 2010, she was notified of an investigation for missing a call, and that in December of 2010, she received a deferred suspension for failing to call a replacement engineer. It is true that the investigation did not proceed, and that the suspension was never served, but these facts support defendants' position, not plaintiff's because they illustrate that, like her

---

[8] For at least this reason, I agree with defendants that plaintiff's evidence that another employee has filed a law suit in which he claims to have seen "racial slurs written on bathroom walls, written on bathroom stalls, written on engines"— none of which plaintiff claims to have seen—does not support her claim that she was terminated because of her race.

colleagues, plaintiff benefitted from progressive discipline. Indeed, even after Clermont became her supervisor, plaintiff continued to receive coaching and other non-disciplinary employment measures before ultimately being disciplined for her mistakes. *See* Def.'s L.R. 56.1 Stmt. ¶¶ 23-24, 26-29. On this record, no reasonable juror could conclude that plaintiff would have kept her job if she had been a different race "and everything else had remained the same." *Ortiz*, 834 F.3d at 764.

In the end, plaintiff's evidence of discrimination boils down to Clermont's remark that she would investigate and fire plaintiff like she did "those two other black girls."[9] But that stray comment is too thin a reed to support the weight of plaintiff's claim. The facts here cannot reasonably be compared to those in either *Hasan v. Foley & Lardner LLP*, 552 F.3d 520 (7th Cir. 2008), or *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572 (D.C. Cir. 2013), which plaintiff cites in her opposition. In *Hasan*, a Muslim attorney brought a discrimination claim after he was terminated by his law firm. The evidence the plaintiff presented at summary judgment included testimony that a year before his termination, one of the firm's partners had said of Muslims, "those people don't belong here...they should kick them

---

[9] Plaintiff also asserts that on another occasion, Clermont referred to her as a "wing nut." Plaintiff does not explain, nor is it obvious from anything else before me, how this comment reflects racial animus.

18

all out." *Hasan*, 552 F.3d at 523. That partner was among those who participated in the meeting at which the plaintiff's termination was discussed. In addition, the plaintiff testified that after that meeting, another partner told him, "too bad that [the first partner] and those guys took out their religious dispute in Israel on you and had you fired." *Id*. at 524. Unlike in this case, the evidence in *Hasan* suggested a clear link between the decision to terminate the plaintiff and religious animus on the part of the decision makers.

In *Ayissi-Etoh*, the evidence suggested an even clearer link between the plaintiff's race and an adverse employment decision. There, the plaintiff was promoted by his employer, but he was denied a salary increase and claimed that his manager told him, "[f]or a young black man smart like you, we are happy to have your expertise; I think I'm already paying you a lot of money." *Ayissi-Etoh*, 712 F.3d at 574. These facts call to mind "the fabled employer who admits to firing an employee because of his race," which the Seventh Circuit invoked in *Ortiz* to illustrate that "some cases permit easy inferences." 834 F.3d at 765. Indeed, the *Ayissi-Etoh* court reversed summary judgment after observing that the individual apparently responsible for making decisions about the plaintiff's salary had "explicitly denied him a raise because of his race." 712 F.3d at 576.

In this case, by contrast, the individuals responsible for the decision to terminate plaintiff were McConnell and Cary, who plaintiff does not claim harbored racial animus against her. Although plaintiff insists that Clermont was responsible for her termination, there is no evidence, other than plaintiff's speculation, that Clermont's alleged bias played any role in the termination decision.

III.

For the foregoing reasons, defendants' motion for summary judgment is granted.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: January 18, 2017